UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
GERALD SPRAYREGEN,

                    Plaintiff,

        -against-                                MEMORANDUM & ORDER
                                                13-CV-5264(JS)(ARL)
A. GUGLIOTTA DEVELOPMENT, INC.,
And ANTHONY R. GUGLIOTTA,

                    Defendants.
--------------------------------X
APPEARANCES
For Plaintiff:          Alex Kriegsman, Esq.
                        Kriegsman PC
                        279 Main St.
                        Sag Harbor, NY 11963

For Defendants:         Anton J. Borovina, Esq.
                        Law Office of Anton J. Borovina
                        510 Broad Hollow Rd., Suite 304A
                        Melville, NY 11747

SEYBERT, District Judge:

        This case arises out of alleged defects in Gerald

Sprayregen's ("Plaintiff") luxury Hamptons home (the "Property"),

which was built and sold by A. Gugliotta Development, Inc. ("AGDI")

and its president, Anthony Gugliotta ("Gugliotta" and,

collectively, "Defendants"). Defendants have now moved for

summary judgment. (Docket Entry 50.) For the following reasons,

Defendants' motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND[1]

I.  Factual Background[2]

A.  The Property

Plaintiff, a Florida resident, purchased the Property from Defendants under a real estate contract for approximately $5 million (the "Contract"). (Def.'s 56.1 Stmt., Docket Entry 44-1, ¶ 13; Contract, Am. Answer Ex. A, Docket Entry 24-1, at 1.)[3] The Property includes a two-story home, a two-story detached garage, an in-ground swimming pool and spa, a wooden deck, and associated landscaping and grading. (Def.'s 56.1 Stmt. ¶¶ 17-19, 21; Bourie Report, Pl.'s Br. Ex. C, Docket Entry 54-4, at 1.) The

---

[1] The following facts are drawn from the parties' 56.1 Statements, their affidavits, and other documents filed in support. Any relevant factual disputes are noted.

[2] Before providing a factual background, the Court must address the untimely filing of Plaintiff's 56.1 Counterstatement. (See Pl.'s 56.1 Counterstmt., Docket Entry 56.) The Court instructed Plaintiff to amend his 56.1 Counterstatement by May 14, 2015; Plaintiff, however, did not do so until July 6, 2015. (See May 7, 2015 Min. Entry, Docket Entry 49; Pl.'s 56.1 Counterstmt.) Yet "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001). And nothing in the record suggests that Defendants were prejudiced by a modest delay in the proceedings. Thus, since the parties were "fairly and adequately apprised of the nature and basis of the application," the Court will consider Plaintiff's 56.1 Counterstatement. See Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc., No. 10-CV-0347, 2013 WL 5725987, at *2 (E.D.N.Y. Oct. 21, 2013).

[3] For the purposes of this Memorandum and Order, the Court will use the page numbers generated by the Electronic Case Filing ("ECF") System when referring to the parties' exhibits.

home also features a wine cellar and a home theater. (Bourie Report at 1.)

Defendants assert that they built the Property on a "speculation basis,"[4] which left "certain functional and decorative details unfinished." (Def.'s 56.1 Stmt. ¶¶ 2-3.) The unfinished details can include "unfinished basements, attics and garages, the placement of unterminated low-voltage wiring inside of walls and ceilings, some of which . . . protrud[e] to enable the wiring to be visible and easily accessible, bathrooms with no towel and toilet paper holders, unfinished or unpainted wall surfaces and floors and pre-wired, undedicated light switches." (Gugliotta Aff. ¶ 5.) Gugliotta explained that the objective was "to complete the construction up to the point where the certificate of occupancy ha[d] been obtained." (Gugliotta Aff. ¶ 4.) In November 2011, the relevant authorities issued a certificate of occupancy and three certificates of electric compliance.[5] (Def.'s 56.1 Stmt. ¶¶ 5-6.)[6]

---

[4] According to Defendants, constructing a home on a "speculation basis" gives the homeowner the freedom to customize the Property to fit his or her needs. (See Def.'s 56.1 Stmt. ¶ 2; Gugliotta Aff., Docket Entry 50-3, ¶ 5.)

[5] The Certificate of Compliance can be found at Defs.' Ex. F, Docket Entry 51-1, at 52-53; and the Certificates of Electrical Compliance can be found at Defs.' Ex. G, Docket Entry 51-1, at 55-58.

[6] In his 56.1 Counterstatement, Plaintiff argues that Defendants should be precluded from relying on the certificate of occupancy

B.    The Contract

Before signing the Contract, Plaintiff and his home inspector, Ted Bourie ("Bourie"), conducted a final inspection of the Property. (Def.'s 56.1 Stmt. ¶ 36; Sprayregen Aff., Pl.'s Br. Ex. B, Docket Entry 54-3, ¶ 5.)  The purpose of the inspection was to uncover any defects that may have occurred during the final stages of construction.  (Def.'s 56.1 Stmt. ¶ 35.)  Bourie inspected the Property's exterior, interior, site, and the garage. (Bourie Report at 1.)  In his review, Bourie made the following observations:

- The exterior was "in good condition" with the exception of doors and windows that did not have screens.

- Generally, the interior, including the plumbing and electrical wiring, was "in good condition," but one fireplace "could be a potential fire hazard."

- All of the outside structures, including the landscaping, the swimming pool and spa,

and the three certificates of electrical compliance due to their failure to disclose the documents during discovery. (Pl.'s 56.1 Counterstmt. ¶¶ 5-6.)  The Second Circuit has cautioned that "[b]efore the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." Outley v. City of N.Y., 837 F.2d 587, 591 (2d Cir. 1988).  Here, the Court finds that Plaintiff did not suffer any prejudice.  Plaintiff admits in his Counterstatement that he received a copy of the certificate of occupancy. (Pl.'s 56.1 Counterstmt. ¶ 40.)  If Plaintiff did not, in fact, receive copies of the certificates of electrical compliance, he at least had the certificate of occupancy, which provided that the Property met the applicable building code.  On that basis, the Court will not preclude them from its review.

and the driveway, are "new" and appear to
be "in good working order."

- The garage contained a few loose wires but
  otherwise had no observable issues.

(See Bourie Report at 1.)  In sum, Bourie found that the Property

was "a well constructed house and in good condition."  (Bourie

Report at 1.)

Following the inspection, Plaintiff purchased the

Property "as is" under the Contract on September 18, 2012. (Def.'s

56.1 Stmt. ¶¶ 10, 13, 41; Contract ¶¶ 2, 12, 32, 38.)  The Contract

contained a Merger Clause, which provided the following:

28. Miscellaneous. (a) All prior
understandings, agreements, representations
and warranties, oral or written, between
Seller and Purchaser are merged in this
contract; it completely expresses their full
agreement and has been entered into after full
investigation, neither party relying upon any
statement made by anyone else that is not set
forth in this contract."

(Contract ¶ 28(a).)  The Contract also provides that "[t]he

delivery of the Deed by Seller and the acceptance of same by

Purchaser shall be deemed the full performance and compliance with

the obligations and covenants to be performed by Seller under the

terms and conditions of this contract, except as otherwise

specifically provided in this contract."  (Contract ¶ 37(l)

(emphasis added).)

The parties supplemented their agreement with a Rider to the Contract and a Supplemental Rider.[7]  Notably, the Supplemental Rider made certain guarantees at the time of closing:

> SRlO. Swimming pool, pool heater, and pool equipment, if any, shall be in proper working order at the time of closing.  If the pool is NOT open at the time of closing, seller shall deliver to purchaser a letter from seller's pool company who services the pool stating that the pool/heater was in proper working order at the time the pool/heater was closed. However, purchaser shall have the option of paying to open the pool/heater in order to inspect same and seller agrees to allow purchaser's pool company access in order to open said pool/heater.
>
> Sprinkler system, if any, shall be in proper working order at the time of closing.  If the sprinkler system is NOT open at the time of closing, seller shall deliver to purchaser a letter from seller's sprinkler company who services the sprinkler system stating that the sprinkler system was in proper working order at the time the sprinkler system was closed. However, purchaser shall have the option of paying to open the sprinkler system in order to inspect same and seller agrees to allow purchaser's sprinkler system company access in order to open said sprinkler system.
>
> * * *
>
> SR13. Prior to closing the Seller shall, at Seller's expense, perform the following work: repair the living room fireplace to be code compliant if after closing found to be non-code compliant; repair and paint the crack in the garage cement; install a gate or arbor in the hedge to provide access to the 17.5 foot

---

[7] The Rider and Supplemental Rider can be found at Docket Entry 24-1 at 5-9 and 10-12, respectively.

strip of land between the hedge and the
                    property line.

(Supplemental Rider ¶¶ SR10, SR13 at 11-12.)

        C.    <u>The Limited Warranty</u>

            Incorporated in the Supplemental Rider was a Limited

Warranty, which identifies Defendants' responsibilities for any

latent or hidden construction defects:

            SR12. <u>BUILDER'S LIMITED WARRANTY</u>

            SELLER shall deliver to PURCHASER at closing
            a Limited Warranty for the new construction
            performed at the subject premises . . . .

            The provisions of the Warranty annexed to this
            agreement are intended to limit the Housing
            Merchant   Implied   Warranty,   contained   in
            Section 777-A, New York State General business
            Law, by providing the Limited Warranty set
            forth in the Limited Warrantee annexed to this
            contract.   This contract expresses the full
            extent   of   the   Limited   Warrantees   being
            provided to the Owner and no warranties shall
            extend beyond those set forth in this contract
            and the Limited Warrantee attached to this
            contract.    The  SELLER  makes  no  other
            warranties,   expressed   or   implied,   in
            connection with this agreement, and all such
            warranties are excluded.   The provisions of
            this paragraph shall survive the closing of
            title. THIS WARRANTY DOES NOT COVER PRODUCTS
            LIABILITY  OR  INCIDENTAL  OR  CONSEQUENTIAL
            DAMAGES.  THIS LIMITED WARRANTY IS GIVEN IN
            LIEU  OF  ALL  OTHER  WARRANTIES,  EXPRESS  OR
            IMPLIED.

(Supplemental Rider ¶ SR12 at 11-12; see Ltd. Warranty at 15.)[8]

The Limited Warranty provides coverage, in relevant part, for the following circumstances:

> FIRST YEAR BASIC COVERAGE: for one year from the warranty date, the home will be free from latent defects that constitute:
>
> (a) defective workmanship performed by the Contractor/Builder, an agent of Contractor/Builder or subcontractor of the Contractor/Builder.
>
> (b) defective materials provided by Contractor/Builder, an agent of Contractor/Builder or subcontractor of the Contractor/Builder; or
>
> (c) defective design provided by an architect, landscape architect, engineer, surveyor or other design professional engaged solely by the Contractor/Builder.
>
> TWO YEAR MAJOR SYSTEM COVERAGE: for two years from the warranty date, the plumbing, electrical, heating systems of the home which have been installed by the Contractor/Builder are warranted to be free from latent defects that constitute defective installation by Contractor/Builder.
>
> SIX YEAR MAJOR STRUCTURAL DEFECT COVERAGE: for six years from the warranty date, the home will be free from latent defects that are major structural defects[9] as defined below and which constitute:

---

[8] The Limited Warranty can be found at Docket Entry 24-1 at 13-21.

[9] As defined by the Limited Warranty, a major structural defect is one "resulting in actual physical damage to the following load-bearing portions of the home caused by failure of such load-bearing portions which affect their load-bearing functions to the extent that the home becomes unsafe, unsanitary or

(a) defective workmanship performed by the Contractor/Builder, an agent of Contractor/Builder or subcontractor of the Contractor/Builder.

(b) defective materials provided by Contractor/Builder, an agent of Contractor/Builder or subcontractor of the Contractor/Builder; or

(c) defective design provided by an architect, landscape architect, engineer, surveyor or other design professional engaged solely by the Contractor/Builder.

(See Ltd. Warranty at 16-17 (emphasis added).)  On the other hand, the Limited Warranty excludes coverage for a number of conditions, including the following:

- Any loss or damages caused by workmanship, defective materials, or defective designs caused by any other person or entity other than Defendants or its agents.  (See Ltd. Warranty ¶ 6(a)-(c).)

- Patent defects that "an examination of the home prior to acceptance of the deed or occupancy of the home ought to have revealed."  (Ltd. Warranty ¶ 6(d).)

- Non-home-related defects, including "detached garages and detached carports (except outbuildings which contain the plumbing, electrical, heating, cooling or ventilation systems serving the home); site located swimming pools and other recreational facilities; driveways; walkways; patios; boundary walls; retaining walls; bulkheads; fences; landscaping (including sodding, seeding, shrubs, trees

---

otherwise unlivable; foundation systems and footings, beams, girders, lintels, columns, walls and partitions, floor systems and roof framing systems."  (Ltd. Warranty at 17.)

> and plantings); off-site improvements or
> any other improvements not a part of the
> home itself." (<u>See</u> Ltd. Warranty ¶ 6(e)
> (emphasis added).)

- Any damages caused by "negligence, improper
  maintenance or improper operation by anyone
  other than [Defendants or their agents]."
  (Ltd. Warranty ¶ 6(h)(i).)

- Any damages caused by "changes, alterations
  or additions made to the home by anyone
  after the Warranty Date." (<u>See</u> Ltd.
  Warranty ¶ 6(h)(v).)

- Any damages caused by "normal wear-and-
  tear." (Ltd. Warranty ¶ 6(n).)

When determining whether a defect warrants coverage, the Limited
Warranty requires Plaintiff to submit a Notice of Warranty before
the applicable coverage period expires. (Ltd. Warranty ¶ 8, at
20-21.)

D.  <u>The Alleged Defects</u>

Shortly after purchasing the Property, Plaintiff
returned home to Florida from the end of October 2012 until May
2013. (Sprayregen Tr., Pl.'s Br. Ex D, Docket Entry 54-5, 192:1-
194:8.) During this time, Plaintiff recruited a caretaker to walk
through the Property twice a week and inspect for any
abnormalities. (Sprayregen Tr. 192:10-16, 194:5-23.) Plaintiff
only recalls three issues that arose under the caretaker's watch:
(1) a malfunctioning bathroom, (2) a faulty drainage ditch in the
driveway, and (3) problems with the installation of a canopy.
(Sprayregen Tr. 195:6-198:6.)

Over the next several months, Plaintiff discovered "scores of defects" that were either "hidden" or "evolving." (Sprayregen Aff. ¶ 10.) Some of the defects included inoperable spa and pool equipment, protruding wires, various leaks, and faulty light switches. (See, e.g., Notice of Warranty, Compl. Ex. A, Docket Entry 1-1, ¶¶ 18-19, 50, 52-53, 57-58, 61-67.) Plaintiff also experienced significant water damage in the basement where his wine cellar and home theater room were located. (Sprayregen Aff. ¶¶ 16-17; Sprayregen Tr. 203:5-12.) On September 9, 2013, nearing the end of his one-year warranty period, Plaintiff served Defendants with a Notice of Warranty listing eighty defects (the "Defects"). (See generally Notice of Warranty.)

Among other things, Plaintiff retained John Condon, P.E., ("Condon") to conduct a home inspection of the Property. (Condon Tr., Pl.'s Br. Ex. K, Docket Entry 54-12, 16:19-17:7.) Condon's inspection uncovered sixty-one defects, which he determined to be latent defects. (Condon Aff., Pl.'s Br. Ex. A, Docket Entry 54-2, ¶¶ 6-7; see Condon Report at 21-24.)[10] In making this determination, Condon noted that neither Plaintiff nor Bourie discovered these sixty-one defects when they inspected the Property before closing. (Condon Aff. ¶ 7.)

---

[10] The Condon Report can be found at Pl.'s Br. Ex. K, Docket Entry 54-2, at 5-27.

Plaintiff also retained Rodney Pierson ("Pierson") to perform a visual inspection of the Property to determine the cause of the water damage. (See Pierson Tr., Pl.'s Br. Ex. F, Docket 54-7, 30:21-31:16.) Pierson concluded that the Property's drywell and drainage system were inadequate. (Pierson Tr. 102:24-103:3; see also Pierson Report, Pl.'s Br. Ex. H, Docket Entry 54-9, at 2 ("In my opinion [a] portion of the drainage system is so poorly constructed that it will never drain the amount of water that could be expected in a heavy down pour and would soon back up water in the basement and around the foundation.").)

II. Procedural History

Plaintiff filed this lawsuit on September 19, 2013.[11] (Compl., Docket Entry 1.) Plaintiff asserts six causes of action: (1) breach of contract – pool & sprinkler system (Am Compl. ¶¶ 47-52); (2) breach of contract – repairs (Am Compl. ¶¶ 53-56); (3) breach of contract – good faith and fair dealing (Am Compl. ¶¶ 57-62); (4) breach of warranty – defective workmanship, materials and/or design (Am Compl. ¶¶ 63-69); (5) breach of warranty – major systems coverage (Am Compl. ¶¶ 70-76); and (6) breach of house merchant implied warranty under General Business Law § 777-a, Article 36-b (Am Compl. ¶¶ 77-83). Thus, the Complaint asserts three claims based on a breach of contract

---

[11] Plaintiff later filed an Amended Complaint, which added Gugliotta as a defendant. (See Am. Compl., Docket Entry 23.)

theory (the "Contract Claims") and three other claims based on a breach of the Limited Warranty (the "Warranty Claims").  (See Am Compl. ¶¶ 47-83.)

On May 15, 2015, Defendants moved for summary judgment. (Docket Entry 50.)  Essentially, Defendants make two arguments: (1) Plaintiff's Contract Claims fail because of the Merger Clause, which extinguished all claims except those under the Limited Warranty or AGDI's post-closing obligation to repair the livingroom fireplace if it failed certain specifications (Defs.' Br., Docket Entry 50-2, at 8-9); and (2) Plaintiff's Warranty Claims are precluded under the Limited Warranty because the defects are either (i) non-home-related, (ii) discoverable, (iii) caused by Plaintiff, or (iv) the result of other conditions, including normal wear-and-tear.  (See Defs.' Br. at 10-18; Schmitt Report, Schmitt Aff. Ex. A, at 11, 15, 18-23.)[12]

In response, Plaintiff argues that summary judgment is inappropriate because this case is an "intensely factual dispute." (Pl.'s Br., Docket Entry 54, at 3.)  First, Plaintiff asserts that Defendants' home improvement theory--that is, that Plaintiff caused certain damages by altering the Property--raises genuine issues of material fact because Plaintiff has offered witnesses that discredit Defendants' theory.  (Pl.'s Br. at 9-15.)  Second,

_____

[12] The Schmitt Report can be found at Schmitt Aff. Ex. A, Docket Entry 50-4, at 9-24.

Plaintiff contends that Defendants distort the meaning of the Limited Warranty and have otherwise failed to show what constitutes a defect. (Pl.'s Br. at 15-23.) And third, Plaintiff argues that the Contract Claims survive because Defendants made representations that certain items would be in good working order at the time of closing. (Pl.'s Br. at 23-25.)

## DISCUSSION

I. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986). In making this determination, the Court must construe all evidence "in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

The moving party bears the burden of proving a genuine issue of material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224

F.3d 33, 41 (2d Cir. 2000) (quoting <u>Anderson</u>, 477 U.S. at 256, 106

S. Ct. at 2514).  "Mere conclusory allegations or denials will not

suffice."  <u>Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986);

<u>Weinstock</u>, 224 F.3d at 41 ("[U]nsupported allegations do not create

a material issue of fact.").

## II.  <u>Admissibility of Plaintiff's Witnesses</u>[13]

As a preliminary matter, Defendants seek to preclude the

testimony of two Plaintiff witnesses--Condon and Pierson--on the

---

[13] Before addressing the merits, Plaintiff argues that the Court
can deny Defendants' motion based on their failure to follow the
procedure set forth in the Limited Warranty.  (Pl.'s Br. at 25,
n.10.)  But this argument is easily disposed of.  The Limited
Warranty provides, in pertinent part, that when the builder
receives a Notice of Warranty, the builder will:

> complete inspection and testing within a
> reasonable time under the circumstances, not
> to exceed thirty (30) days after receipt of a
> timely and properly completed Notice of
> Warranty Claim Form.  <u>Upon completion of
> inspection and testing,</u> the Builder will
> determine whether to accept or reject the
> claim.  If the Builder rejects the claim, the
> Builder will give written notice of that
> decision to the claimant . . . .

(Ltd. Warranty ¶ 8.2, at 20 (emphasis added.))  Although
Defendants did not conduct an inspection within thirty days, the
Court notes that only ten days elapsed between Defendants'
receipt of the Notice of Warranty and the filing of the
Complaint.  (Gugliotta Aff. ¶¶ 38, 40; <u>see</u> Compl.).  And
Gugliotta asserts that after Plaintiff filed the Complaint,
Gugliotta did not have access to the Property "to observe or
address any of the Conditions described in the [Notice of
Warranty]."  (Gugliotta Aff. ¶ 40.)  Put another way, Gugliotta
could not complete an inspection and, thus, could not follow the
procedure set forth in the Limited Warranty.

ground that their opinions are unreliable.[14] (See Defs.' Reply Br., Docket Entry 55, at 3-6.)[15] Thus, the Court must decide whether the opinions are admissible, "as only admissible evidence may be considered when deciding a motion for summary judgment." See Nussbaum v. Metro-North Commuter R.R., 994 F. Supp. 2d 483, 488-89 (S.D.N.Y. 2014); Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("The court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment."). If the opinions are inadmissible, "the summary judgment determination is made on a record that does not include that evidence." See Borgognone v. Trump Plaza, No. 98-CV-6139, 2000 WL 341135, at *2 (E.D.N.Y. Mar. 9, 2000).

As the Second Circuit has recognized, district courts have "broad discretion in admitting expert testimony." See, e.g., Rochester Gas & Elec. Corp. v. GPU, Inc., 355 F. App'x 547, 551 (2d Cir. 2009); see also Lappe v. Am. Honda Motor Co., 857 F. Supp. 222, 227 (N.D.N.Y. 1994) (stating that the Court's evaluation must

---

[14] Defendants also argue that Plaintiff's pool repair estimate is inadmissible hearsay. (Defs.' Reply Br. at 6.) But the Court will not consider this argument because Defendants raised it for the first time in their reply papers. See Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993).

[15] While this Circuit "disfavors new issues being raised in reply papers," Rowley v. City of N.Y., No. 00-CV-1793, 2005 WL 2429515, at *5 (S.D.N.Y. Sept. 30, 2005) (collecting cases), Defendants challenged the admissibility of these witnesses in a letter to the Court dated April 3, 2015. (Apr. 3, 2015 Ltr., Docket Entry 44, at 2-3.)

be flexible and that the "expert should not be required to satisfy an overly narrow test of his own qualifications"), aff'd sub nom., Lappe v. Honda Motor Co. Ltd. of Japan, 101 F.3d 682 (2d. Cir. 1996). Under Federal Rule of Evidence 702, a district court can admit expert testimony from an individual "qualified as an expert by knowledge, skill, experience, training, or education" so long as such "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). And, as the Supreme Court made clear, the district court has a "special obligation" to ensure that any and all expert testimony "'is not only relevant, but reliable.'" Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993)). Plaintiff, as the party offering the expert testimony, must establish its admissibility by a preponderance of the evidence. Hollman v. Taser Int'l Inc., 928 F. Supp. 2d 657, 666-67 (E.D.N.Y. 2013).

A.    Condon

Defendants argue that Condon's opinions are unreliable because he did not conduct a forensic examination on any of the conditions he observed. (Defs.' Reply Br. at 3-5.) The Court disagrees.

As discussed above, Plaintiff had hired Condon to conduct a home inspection of the Property. (Condon Tr. 16:19-17:7.) Condon has a Bachelor's Degree in electrical engineering from the City College of New York and has been a licensed professional engineer for forty years. (Condon Aff. ¶ 1.) He is also a member of the National Society of Professional Engineers, the National Academy of Building Inspection Engineers, and the American Society of Home Inspectors. (Condon Aff. ¶ 1.) As a home inspector, Condon's job is to "point out any obvious visual defects or unusual aspects of a building that [he] inspect[s]." (Condon Tr. 13:12-17.) During Condon's inspection of the Property, he uncovered sixty-one defects, which he concludes to be latent defects. (Condon Aff. ¶¶ 6, 7; see Condon Report at 21-24.) He based his conclusion, in part, on the fact that both Plaintiff and Bourie inspected the Property before closing and did not discover these sixty-one defects. (Condon Aff. ¶ 7.)

Despite Defendants' objections to the contrary, the Court finds that Condon's observations are sufficiently reliable. It is true that Condon did not perform any forensic evaluations. (See, e.g., Condon Tr. 13:23-14:3.) Instead, he notes whether any equipment or fixtures are operating properly but does not address the reason why they are malfunctioning. (Condon Tr. 17:12-23, 18:5-13, 23:17-24:18, 85:6-18, 88:24-90:23, 122:3-20.) Although Condon concedes that those conditions may not necessarily be

indicative of a defect, his observations are sufficient to raise a genuine issue of material fact. Put differently, Defendants' argument goes to the weight of Condon's testimony, not its admissibility.[16]  See MacQuesten Gen. Contracting, Inc. v. HCE, Inc., No. 99-CV-8598, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002). Any further challenges can be made on cross-examination. Daubert, 509 U.S. at 596, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Thus, Plaintiff has demonstrated by a preponderance of the evidence that Condon's testimony is admissible.

B.  Pierson

As to Pierson, Defendants assert that Pierson is neither a fact witness nor was he identified in Plaintiff's disclosure of expert testimony dated December 31, 2014 (the "Disclosure").[17]

---

[16] For instance, Schmitt states that Condon's recommendation for stronger railing near the long rear balcony is without factual basis. (Schmitt Report at 15; see also Condon Report at 22 (finding that the railing was "excessively flexible").) In Schmitt's opinion, the "building inspector would not have issued the certificate of occupancy" if the railing was non-code-compliant, and Condon did not perform a test to determine as much. (Schmitt Report at 15.) Even still, Defendants can challenge Condon's recommendation and his lack of any testing on cross-examination.

[17] The parties agree that only Condon was identified in the Disclosure. (Pl.'s Br. at 12, n.5; Defs.' Reply Br. at 5, n.5.)

(Defs.' Reply Br. at 5-6.)  Plaintiff concedes that Pierson is not

an expert witness but argues that he is a fact witness by

analogizing to cases involving treating physicians.  (Pl.'s Br. at

12, n.5 (collecting cases).)  The Court, however, is not persuaded

by this analogy.

The Federal Rules of Civil Procedure recognize a

distinction between expert witnesses and fact witnesses, such as

treating physicians:

> The requirement of a written report in
> paragraph (2)(B), however, applies only to
> those experts who are retained or specially
> employed to provide such testimony in the case
> or whose duties as an employee of a party
> regularly involve the giving of such
> testimony. A treating physician, for example,
> can be deposed or called to testify at trial
> without any requirement for a written report.

FED. R. CIV. P. 26 Advisory Committee Notes to 1993 Amends. (1)(b);

see also Chen-Oster v. Goldman, Sachs & Co., No. 10-CV-6950, 2015

WL 1035350, at *12 (S.D.N.Y. Mar. 10, 2015) ("[A] witness must

either have first-hand knowledge of the matter about which he

testifies, and so testify as a percipient witness, or he must

utilize expertise in order to aid the finder of fact in

understanding esoteric or complex evidence.").  Indeed, treating

physicians "'are a species of percipient witness . . . not

specifically hired to provide expert testimony; rather, they are

---

The Court, however, notes that it cannot locate the Disclosure
on ECF.

hired to treat the patient and may testify to and opine on what they saw and did . . . .'" Puglisi v. Town of Hempstead Sanitary Dist. No. 2, No. 11-CV-0445, 2013 WL 4046263, at *3 (E.D.N.Y. Aug. 8, 2013) (quoting Goodman v. Staples The Office Superstore, LLC, 644 F.3d 817, 819 (9th Cir. 2011) (first ellipses in original)); see also Turner v. Delta Air Lines, No. 06-CV-1010, 2008 WL 222559, at *1 (E.D.N.Y. Jan. 25, 2008) ("[I]f the witness testifies only to the opinions formed in providing plaintiff medical care, such opinions are considered an explanation of treatment notes and the physician may properly be characterized as a fact witness."). Thus, a treating physician's testimony must be based on personal knowledge, not outside sources. See Smolowitz v. Sherwin-Williams Co., 02-CV-5940, 2008 WL 4862981, at *4 (E.D.N.Y. Nov. 10, 2008).

Plaintiff hired Pierson to perform a visual inspection of the Property to determine the cause of a flood. (Pierson Tr. 30:21-31:16.) Pierson stated that he holds licenses from the Suffolk County Department of Health Services Liquid Waste, the Suffolk County Department of Consumer Affairs, the Town of Southampton Contractors, and the Town of East Hampton Contractors. (Pierson Tr. 31:20-32:4.) At his deposition, Pierson's testimony indicated that he has no specialized training in understanding how water infiltrates a basement and instead relied solely on his "life experience." (Pierson Tr. 32:5-10.) Ultimately, Pierson

concluded that the Property's drywell and drainage system were inadequate.  (Pierson Tr. 102:24-103:3.)

Here, Plaintiff analogizes Pierson to treating physicians, arguing that he drafted his report, in the ordinary course of business, "well in advance of the lawsuit to assess the water damage."  (Pl.'s Br. at 12, n.5.)  But that analogy fails because Pierson lacks personal knowledge on how the Property was constructed and how the water entered into the basement.  (See Pierson Tr. 35:22-36:21, 63:25-64:10); see also Salas v. United States, 165 F.R.D. 31, 33 (W.D.N.Y. 1995) ("The relevant question is whether these treating physicians acquired their opinions . . . directly through their treatment of the plaintiff.").  Rather, he relied on what Plaintiff saw.  (Pierson Tr. 35:22-36:21.)  Pierson also prepared his estimate on June 19, 2013--long after Defendants finished construction of the Property.  (See Pierson Estimate, Pl.'s Br. Ex. G, Docket Entry 54-8; Def.'s 56.1 Stmt. ¶ 13.)  Thus, Plaintiff has failed to demonstrate that Pierson's testimony is akin to a treating physician, and the Court will not consider any evidence related to Pierson's findings.

III. The Contract Claims

Defendants first move for summary judgment on Plaintiff's Contract Claims.  Defendants argue that the Contract Claims are barred by the Merger Clause, which extinguished all claims except those based on the Limited Warranty or AGDI's post-

closing obligation to repair the livingroom fireplace. (Defs.'
Br. at 8-9.) The Court disagrees.

As a general rule, a real estate contract merges into
the deed at the time of closing, and the buyer forfeits all
contract claims except for those the parties intended to survive
the transfer of title. Cerand v. Burstein, 72 A.D.3d 1262, 1264,
897 N.Y.S.2d 789, 791 (3d Dep't 2010) (citing Hunt v. Kojac, 245
A.D.2d 858, 858-59, 666 N.Y.S.2d 330, 332 (3d Dep't 1997)); Sunoco,
Inc. (R&M) v. 175-33 Horace Harding Realty Corp., 969 F. Supp. 2d
297, 305 (E.D.N.Y. 2013). It bears emphasizing, however, that the
Merger Clause precludes the Contract Claims only if they are based
on the Limited Warranty. See Gallup v. Summerset Homes, LLC, 82
A.D.3d 1658, 1661, 920 N.Y.S.2d 504, 507 (4th Dep't 2011). In
other words, Plaintiff may assert claims arguing that Defendants
"violated specific provisions of [the Contract] other than the
warranty provisions." See Tiffany at Westbury Condominium v.
Marelli Dev. Corp., 40 A.D.3d 1073, 1075-76, 840 N.Y.S.2d 74, 77
(2d Dep't 2007).

The Court first observes that Plaintiff asserted three
Contract Claims in his Amended Complaint: (1) pool & sprinkler
system (Am Compl. ¶¶ 47-52); (2) repairs (Am Compl. ¶¶ 53-56); and
(3) good faith and fair dealing (Am Compl. ¶¶ 57-62). Next, the
Court must determine whether the parties intended for any contract
provisions to survive the transfer of title, see Arnold v. Wilkins,

23

61 A.D.3d 1236, 1236, 876 N.Y.S.2d 780, 781 (3d Dep't 2009) or whether Plaintiff's claims assert any violations of the Contract outside of the warranty provisions. See Tiffany at Westbury Condominium, 40 A.D.3d at 1075-76.

The Court begins with the Contract's Merger Clause, which provides, in pertinent part, that "[t]he delivery of the Deed by Seller and the acceptance of same by Purchaser shall be deemed the full performance and compliance with the obligations and covenants to be performed by Seller under the terms and conditions of this contract, except as otherwise specifically provided in this contract." (Contract ¶ 37(l) (emphasis added).) As relevant here, the Supplemental Rider made the following guarantees:

- "Swimming pool, pool heater, and pool equipment, if any, shall be in proper working order at the time of closing." (Supplemental Rider ¶ SR10.)

- "Sprinkler system, if any, shall be in proper working order at the time of closing." (Supplemental Rider ¶ SR10.)

- "The provisions of the [Limited] Warranty annexed to this agreement are intended to limit the Housing Merchant Implied Warranty, contained in Section 777-A, New York State General business Law, by providing the Limited Warranty set forth in the Limited Warrantee annexed to this contract. This contract expresses the full extent of the Limited Warrantees being provided to the Owner and no warranties shall extend beyond those set forth in this contract and the Limited Warrantee attached

24

to this contract. The SELLER makes no other warranties, expressed or implied, in connection with this agreement, and all such warranties are excluded. <u>The provisions of this paragraph shall survive the closing of title.</u> THIS WARRANTY DOES NOT COVER PRODUCTS LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES. THIS LIMITED WARRANTY IS GIVEN IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED." (Supplemental Rider ¶ SR12 (alteration and emphasis added).)

- "Prior to closing the Seller shall, at Seller's expense, perform the following work: <u>repair the living room fireplace to be code compliant if after closing found to be non-code compliant</u>; repair and paint the crack in the garage cement; install a gate or arbor in the hedge to provide access to the 17.5 foot strip of land between the hedge and the property line." (Supplemental Rider ¶ SR13.)

Based on this language, Defendants assert that the parties intended for only two provisions to survive: the Limited Warranty and AGDI's post-closing obligation to repair the livingroom fireplace, if found to be non-code-compliant after closing. (Def.'s Br. at 9.)

Plaintiff, however, argues that the Supplemental Rider is ambiguous in two ways. (Pl.'s Br. at 23-25.) First, the Supplemental Rider provides that Defendants have a continued obligation to repair the livingroom fireplace if it is found to be non-code-compliant after the closing. (Supplemental Rider at SR13.) Yet no caveat was made for Defendants' two other obligations: (1) repairing and painting the crack in the garage cement and (2) installing a gate or arbor in the hedge. Thus,

Plaintiff correctly points out that he is left with a breach of contract claim if Defendants fail to fulfill those two obligations. (Pl.'s Br. at 24; See generally Supplemental Rider ¶ SR13.)

Second, Plaintiff contends that any issues concerning the pool and sprinkler system survive the closing because Defendants promised that they would be "in proper working order at the time of closing." (Pl.'s Br. at 24-25; see Supplemental Rider at SR10.) A pair of cases provide helpful context on this issue. Joseph v. Creek & Pines, Ltd., 217 A.D.2d 534, 535, 629 N.Y.S.2d 75, 76 (2d Dep't 1995); Arnold, 61 A.D.3d at 1236-37, 876 N.Y.S.2d at 781. In Joseph, the real estate contract stated, in pertinent part, that the property's septic systems would be in "good working order" at the time of closing. Id. After the parties signed the contract, the septic systems malfunctioned. Id. In a very brief opinion, the Second Department found that the representation about the septic system--that it would be in "good working order"--was intended to survive the closing. Id. In reaching that conclusion, the court reasoned that "the only fair interpretation of the contract is that the parties intended the representation . . . to survive the closing." Id.

By contrast, the Third Department confronted similar circumstances in Arnold but reached a different result. 61 A.D.3d at 1236-37. There, like Joseph, the parties entered into a real estate contract that guaranteed that the sewage system would be

"in good working order as of the date of closing," and the sewage system experienced severe problems after the closing. Id. at 1236. But the Arnold court found that the real estate contract did "not specify that any of its provisions [were] to survive the transfer of title and nothing in the record evidence[d] such an intent." Id. at 1237. In that respect, the court held that any claims arising out of the contract were extinguished by the merger clause. Id.

Here, the Court finds a conflict between the Supplemental Rider and the Limited Warranty. The Supplemental Rider provides for potential post-closing obligations for the livingroom fireplace but is ambiguous as to other obligations-- namely, the crack in the garage cement and the installation of a gate or arbor. Plaintiff argues, and the Court agrees, that "this ambiguity is only heightened by the conduct of the parties, who evidently continued to ask for and undertake, respectively, a variety of repair[s] . . . some of which were undertaken for other consideration, and others not." (Pl.'s Br. at 18; see also Gugliotta Aff. ¶¶ 51-53 (discussing how Defendants and Plaintiff executed a separate agreement that "ha[s] nothing to do with the Limited Warranty" to install screen doors throughout Plaintiff's home).) In an e-mail dated December 17, 2012, for example, the parties discussed the progress of a certain paint job and the installation of screen doors. (Sprayregen Tr. 222:7-223:17.)

Roughly one month later, the parties also discussed the installation of a new floor in the theater room. (Sprayregen Tr. 252:10-253:18.) In light of these ambiguities, the Court finds that Plaintiff has raised a genuine issue of material fact, and Defendants' motion is DENIED as to the Contract Claims.

## IV. The Warranty Claims

Defendants also move for summary judgment on Plaintiff's Warranty Claims. (Defs.' Br. at 10-18.) To categorize the Defects, the Court has reviewed Defendants' brief, Gugliotta's affidavit, and the affidavit and report of Defendants' expert, Joseph Schmitt, P.E ("Schmitt"). After careful consideration of these documents, the Court has grouped the Defects into four categories: (1) Non-Home-Related Conditions, (2) Discoverable Conditions, (3) Home Improvement-Related Conditions, and (4) Miscellaneous Conditions.[18] The Court will address all four categories below.[19]

---

[18] The Court notes that Defect no. 6 falls into two categories-- Non-Home-Related Condition and a Home Improvement-Related Condition.

[19] Plaintiff produced a list of defects that are allegedly not in dispute. (See Pl.'s Br. Ex. M, Docket Entry 54-14.) To be sure, Defendants do not address all of the supposed defects in their brief, but their supporting documents do. (See, e.g., Gugliotta Aff.; Schmitt Aff., Docket Entry 50-4; Schmitt Report).

A.    Non-Home-Related Conditions

First, Defendants argue that approximately twenty-five Defects are excluded from coverage because they exist outside of the home.  (Def.'s Br. at 12; see also Ltd. Warranty 6(e) (excluding from coverage non-home-related defects, including those related to the detached garage, swimming pool, and landscaping).) These Non-Home-Related Conditions can be further described in four sub-groups:

> a. Garage-Related Conditions: 13 (hinges), 14 ([guard] rail), 15 (weather strip), 16 (paper holder/towel rods), 17 (shower enclosure), 54 (furnace), 76 (thermostat), 77 (protruding low voltage cables), 78 (protruding low voltage wiring), 79 (protruding low voltage cables), 80 (dead light bulbs);
>
> b.    Pool-Related    Condition:    18    (spa/ equipment), 19 (pool heater), 20 (lack of pool ground wire), 21 (pool fence), 22 (pool alarm), 74 (pool light), 75 (hot tub equipment);
>
> c. Ground-Related Conditions: 6 (front yard grading), 8 (rear yard hole in ground), 9 (dislodged driveway drainage grill), 12 (flagstone slabs at base of the landing), 51 (irrigation sprinkler system);
>
> d. Appliance-Related Condition: 70 (wine cooler).[20]

(Gugliotta Aff. ¶¶ 45, 87.)   While most of these items are unambiguously excluded, Plaintiff makes a persuasive argument that

---

[20] Defendants argue that even though the wine cooler is located within the home, it is an appliance, which is covered by a manufacturer's warranty, not the Limited Warranty. (Gugliotta Aff. at 12, n.2.)

the Limited Warranty is ambiguous as to the Ground-Related items. (Pl.'s Br. at 15-18.)

In examining the Limited Warranty, the Court will use basic principles of contract interpretation. As an initial matter, the interpretation of a contract is a question of law, including "the threshold question of whether the terms of the contract are ambiguous." Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, Eng., 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted). "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning," summary judgment is proper. See Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985) (collecting cases). Contract language is unambiguous when it has "'a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352 (1978)). By contrast, an ambiguity exists when the contract language is "capable of more than one meaning when viewed objectively by a reasonably intelligent person." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396-97 (2d Cir. 2009) (internal quotation marks and citations omitted).

Simply stated, the Limited Warranty provides three forms of coverage:

- **First Year Basic Coverage.** For one year from the warranty date, the Limited Warranty provided that <u>the home</u> would be free from latent defects that constitute defective workmanship and defective materials from Defendants or its agents and subcontractors. The Limited Warranty also provided that <u>the home</u> would be free from latent defects that constitute defective design provided by "an architect, <u>landscape architect</u>, engineer, surveyor or other design professional engaged solely by [Defendants]."

- **Two Year Major System Coverage.** For two years from the warranty date, the Limited Warranty provided that the plumbing, electrical, and heat systems <u>of the home</u> installed by Defendants would be free from latent defects that constitute defective installation by Defendants.

- **Six Year Major Structural Defect Coverage.** For six years from the warranty date, the Limited Warranty provided that <u>the home</u> would be free from latent defects that are major structural defects that constitute defective workmanship and defective materials from Defendants or its agents and subcontractors. The Limited Warranty also provided that <u>the home</u> would be free of latent defects that are major structural defects that constitute defective design provided by "an architect, <u>landscape architect</u>, engineer, surveyor or other design professional engaged solely by [Defendants]."

(<u>See</u> Ltd. Warranty at 16-17 (emphasis added).) On that basis, the Garage-Related and Pool-Related Conditions are excluded from coverage because they exist outside of the home. Similarly, even though the Appliance-Related Condition technically occurs within the home, the Limited Warranty states that damages to certain non-

load bearing portions of the home, including appliances, do not constitute a Defect. (Ltd. Warranty at 17.) In sum, the Court finds that the Garage-Related, Pool-Related, and Appliance-Related Conditions are excluded from coverage.

Yet the inclusion of the term "landscape architect" creates an ambiguity whether the Ground-Related items are excluded from coverage. The Limited Warranty states, in relevant part, that "landscaping (including sodding, seeding, shrubs, trees and plantings)" are non-home-related defects. (Ltd. Warranty ¶ 6(e).) But under both its First Year Basic Coverage and Six Year Major Structural Defect Coverage, the Limited Warranty provides that the home would be free of latent defects that constitute defective design caused by "an architect, <u>landscape architect</u>, engineer, surveyor or other design professional engaged solely by [Defendants]." The Court supposes that a landscape architect could enter the home and cause a defect to occur, but that determination is the jury's to make, not the Court's. See <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511. Cf. <u>Weinheim v. Spring Lake Bldg. Corp.</u>, 31 Misc. 3d 1239(A), at *5, 930 N.Y.S.2d 177 (Cty. Ct., Suffolk Cty., 2011) (excluding coverage for driveways and grading, for example, where a limited warranty explicitly excluded "driveways" and "landscaping (including sodding, seeding, shrubs, trees and plantings)" but lacked a similar ambiguity over the term "landscape architect" under coverage for the home). By including the term

"landscape architect," a portion of the Limited Warranty is "capable of more than one meaning when viewed objectively by a reasonably intelligent person." JA Apparel Corp., 568 F.3d at 396-97 (internal quotation marks and citations omitted). Thus, Defendants' motion is GRANTED as to the Ground-Related, Pool-Related, and Appliance-Related Conditions but DENIED as to the Ground-Related Conditions.

B.    Discoverable Conditions

Second, Defendants assert that the Limited Warranty excludes all conditions that were open and discoverable prior to closing. (Def.'s Br. at 13-15; see also Ltd. Warranty 6(d) (excluding from coverage all "defects which an examination of the home prior to acceptance of the deed or occupancy of the home ought to have revealed").) Defendants contend that the following conditions were open and discoverable: 4 (protective tape over front door saddle), 24 (sloppy paint applied to a wall), 26 (ball latch), 27 (unpainted cellar room wall), 28 (wall openings), 29 (no paper/towel holder/rods in bathrooms), 30 (no lock), 34 (pocket doors bind), 35 (rotary doors bind), 36 (hole in ceiling), 39 (door not close), 40 (hanging electrical receptacles), 41 (open junction boxes), 42 (missing receptacle cover plate), 44 (unterminated cable), 45 (protruding low voltage wiring), 46 (protruding low voltage wiring), 47 (protruding low voltage wiring), 48 (front doorbell missing with protruding wires present), 49 (protruding

low voltage wiring), 50 (protruding low voltage wiring), 55 (fireplace lintel openings), 57 (undedicated master bed switches), 59 (protruding low voltage wiring), 60 (protruding data/power cables), 61 (undedicated stair switches), 63 (undedicated switch), 65 (undedicated switch), 66 (undedicated switch), 67 (undedicated switch), 68 (phone jack hole), 71 (protruding low voltage wiring), 72 (undedicated switch), and 73 (protruding low voltage wiring). (Gugliotta Aff. ¶ 46.)

Having examined the record, the Court finds that there are issues of fact concerning the Discoverable Conditions. Defendants argue that the Discoverable Conditions were "visible and obvious" and included "the lack of any toilet paper or towel holders or shower curtains in the bathrooms and protruding low voltage wire from the ceiling and walls [and] open receptacle boxes." (Def.'s Br. at 13.) Although some of those defects should have been obvious at first glance, Plaintiff submitted an affidavit, under penalty of perjury, discussing how he inspected the Property pre-closing but only found "scores of defects" post-closing. (See Sprayregen Aff. ¶¶ 5, 10.) Plaintiff also provided the Bourie Report, which reviewed the Property's exterior, interior, site, and the garage. (Bourie Report at 1.) With a few exceptions, Bourie stated that the Property was "a well constructed house and in good condition." (Bourie Report at 1.) As a result, there is a legitimate factual dispute on this issue.

Defendants' next argument--that a series of photographs taken in 2014 depict the same conditions that were present when Plaintiff inspected the Property in 2012--is without merit. (Def.s' Reply Br. at 7 (citing United States v. Consol. Laundries Corp., 291 F.2d 563, 569 (2d Cir. 1961)); see Def.'s 56.1 Stmt. ¶¶ 13, 36.) Essentially, Defendants argue that although the photographs were taken in April and December 2014, the Court may infer that the conditions in the photograph existed at the time of closing.[21] (Def.'s Br. at 14-15; see Gugliotta Aff. ¶¶ 48, 92.) But generally, inferences do not run backward. See LoCascio v. United States, 267 F. Supp. 2d 306, 309 (E.D.N.Y. 2003) (citing Russell, Poling & Co. v. Conners Standard Marine Corp., 252 F.2d 167, 170 (2d Cir. 1958)). Quite the contrary, an inference that a present condition existed at a prior date is proper only "where the present condition is one that ordinarily would not exist unless it had also existed at the time as to which the presumption is invoked." Russell, 252 F.2d at 170.

The Second Circuit's decision in Consolidated Laundries, the case cited by Defendants, is instructive. 291 F.2d at 569. There, the evidence at issue was a file of forty-three documents that related to an attorney's prosecution of an anti-trust matter

---

[21] The photographs can be found at Exhibit Binder I, Docket Entry 51-1, at 60-93; Exhibit Binder II, Docket Entry 52-1, at 1-22, 101-08; and Exhibit Binder III, Docket Entry 53-1, at 78-86.

(the "Owen File").  Id. at 568 n.2.  The defendant-linen supply corporations moved for a new trial because the government failed to disclose the contents of the Owen File, which may have been useful for defendants on cross-examination of a certain witness. Id. at 568, 569-71.  In response, the government argued that the defendants failed to prove that the Owen File was in the government's possession during trial.  Id. at 569.  Yet the Second Circuit observed that because the government had possession of the Owen File shortly after trial ended, "it is a proper inference . . . that the Government had possession of it during the trial." Id.

Here, unlike the static nature of the Owen File, the condition of the Property is dynamic and could have easily changed. In fact, roughly nineteen to twenty-seven months elapsed between the date of Plaintiff's inspection and the dates of the photographs.  (Def.'s 56.1 Stmt. ¶ 13; Gugliotta Aff. ¶¶ 48, 92.) And although Gugliotta claims that Plaintiff agreed to "take care of those unfinished details," (Gugliotta Aff. ¶ 14), Plaintiff says otherwise, thereby raising a genuine issue of material fact. (See Sprayregen Aff. ¶¶ 5, 10.)  Thus, Defendants' motion is DENIED as to the Discoverable Conditions.

C.  Home Improvement-Related Conditions

Third, Defendants argue that two Defects-- nos. 6 (front yard grading) and 7 (gutters)--are excluded from coverage because

Plaintiff caused them to occur by making certain home improvements. (Def.'s Br. at 15-18; see also Ltd. Warranty 6(h)(v) (excluding coverage for any damages caused by "changes, alterations or additions made to the home by anyone after the Warranty Date")). Since Plaintiff has submitted contradictory evidence, however, the Court must deny summary judgment on this issue.

Plaintiff alleges that he suffered damages because of the "woefully inadequate design and functionality of the [Property's] waterproofing and water run-off drainage systems." (Pl.'s Br. at 10.) In fact, Plaintiff asserts in his sworn affidavit that "[a]s a result of Defendants' cost-saving measures, [he] experienced significant water damage . . . ." (Sprayregen Aff. ¶ 16.) To bolster this assertion, Plaintiff submits the Condon Report, which concludes, in part, that the grading below the deck "very likely contributed to the water infiltration conditions in the cellar." (Condon Report, ¶ 7, at 21.) Condon also testified in his deposition that the soil under the house was "very obviously not back filled properly and not gra[d]ed properly." (Condon Tr. 77:20-78:10.)

Defendants argue in opposition that the water damage occurred because Plaintiff extended the Property's wood deck, built a brick patio, and constructed flagstone slabs. (Gugliotta Aff. ¶¶ 31-35.) In support, Defendants submitted the affidavit of Keith Dupree, who designs and constructs septic and rainwater

runoff systems. (Dupree Aff., Docket Entry 50-6, ¶ 2.) Dupree attests that the water overflow "was caused by the drainage pipe having been moved, cut and replaced during the construction of the extended wood deck and the brick patio." (Dupree Aff. ¶ 8.) While all of that could be true, the role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511. Thus, summary judgment is unwarranted, and Defendants' motion is DENIED as to the Home Improvement-Related Conditions.

D.   <u>Miscellaneous Conditions</u>

Finally, Defendants dispute coverage for a number of other Defects: 1 (gutter overflow), 2 (faulty front door), 3 (torn weather strip), 5 (exposed slide tape), 10 (blocked emergency opening), 11 (excessively flexible railings), 23 (no plywood flooring in the attic), 25 (no ventilation in the media closet), 31 (paint cracks), 32 (anticipated cracks in the grout), 33 (squeaking flooring), 37 (tape on ceiling), 38 (faulty door stops), 43 (faulty Ground Fault Circuit Interrupter), 52 (small leak), 53 (small leak), 56 (improperly installed door handles), 58 (faulty light switch), 62 (faulty light switch), 64 (faulty light switch), and 69 (faulty light switches). (<u>See</u> Schmitt Report at 11, 15, 18-23); <u>see also</u> Notice of Warranty (providing a description of the Defects).) Essentially, Defendants assert that those Defects:

(1) arose out of normal wear and tear, (2) occurred because of parties other than Defendants or their agents, and (3) did not exist based on Schmitt's review of the Property. (See Schmitt Report at 11, 15, 18-23; see also Ltd. Warranty 6(h)(v) and 6(n).)

Defendants allege that certain Defects are unfinished details because the Property was built on a "speculation basis." (Def.'s 56.1 Stmt. ¶¶ 2-3; Gugliotta Aff. ¶ 6; Schmitt Aff. ¶ 20.) As discussed above, however, Plaintiff emphasizes that he only discovered the Defects post-closing. (See Sprayregen Aff. ¶¶ 5, 10.) Plaintiff also provided a report by Bourie, who reviewed the Property's exterior, interior, site, and the garage pre-closing. (Bourie Report at 1.) By and large, Bourie stated that the Property was "a well constructed house and in good condition." (Bourie Report at 1.) As a result, Plaintiff has demonstrated a genuine issue of material fact that must be left to the jury.

Further, Defendants' reliance on the certificate of occupancy does not change this result. (Def.'s Br. at 12-13.) To begin with, "the issuance of a certificate of occupancy establishes that the premises are in compliance with the requirements of the building code and other applicable laws." Inner City Drywall Corp. v. Reliance Ins. Co. of N.Y., 263 A.D.2d 438, 439, 694 N.Y.S.2d 31, 32 (1st Dep't 1999). But it does not absolve Defendants' obligations under the Limited Warranty. See Horwitz v. Camelot Assoc. Corp., 66 A.D.3d 1299, 1301, 888 N.Y.S.2d 241, 243 (3d Dep't

39

2009) (finding that a contractor's reliance on independent professionals, including a building inspector who issued a certificate of occupancy, did "not provide a defense to [the contractor's] obligation under the home warranty"); see also Beecher v. N. Men's Sauna, 272 A.D.2d 281, 281-82, 707 N.Y.S.2d 465, 465-66 (2d Dep't 2000) (noting that an architect "made a prima facie showing of his entitlement to summary judgment," in part, by presenting a certificate of occupancy, "thereby shifting the burden to the opposing parties to establish an issue of material fact").

In that regard, Plaintiff addresses how the certificate of occupancy was issued on November 11, 2011--nearly one year before Plaintiff purchased the Property and almost two years before Plaintiff filed his Notice of Warranty. (Def.'s 56.1 Stmt. ¶¶ 5-6, 13; Notice of Warranty at 1.) What is more, Schmitt testified at his deposition that a condition of the home may comply with the building code but still be defective. (See, e.g., Schmitt Tr., Pl.'s Br. Ex. J, Docket Entry 54-11, 79:5-80:8 (discussing that the absence of plywood flooring, for example, was a defect but did not constitute a building code violation).) Thus, in light of Plaintiff's evidence, Defendants' motion is DENIED as to the Miscellaneous Conditions.

CONCLUSION

Defendants' motion for summary judgment (Docket Entry 50) is GRANTED IN PART and DENIED IN PART.  Defendants' motion is specifically GRANTED on the Garage-Related, Pool-Related, and Appliance-Related Conditions, which are listed in Plaintiff's Notice of Warranty as defect nos. 13-22, 54, 70, and 74-80.  (See Docket Entry 1-1.)  The motion is otherwise DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      February   26  , 2016
            Central Islip, New York